## Case No. 16,703.

### UNITED STATES v. The WILLIAM POPE.

[1 Newb. 256.] 1

District Court, D. Missouri.    March, 1852.

STEAM VESSELS—REGULATIONS FOR SAFETY OF PASSENGERS—LICENSE AND ENROLLMENT—FERRY BOATS—COASTING TRADE.

1. The act of July 7, 1838 [5 Stat. 304], "To provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam," was not intended by congress to apply to all steamboats, but only to such as before the passage of that act were required to be enrolled and licensed for the coasting trade.

2. Under the laws of congress enacted prior to that of 1838, ferry boats were not required to be enrolled and licensed.

3. The words, "coasting trade," mean, the trade along the shore, and the business of a ferry boat is not included therein.

[Cited in Ravesies v. U. S., 35 Fed. 919.]

4. A license from the United States, and a license from a state, are not both necessary to authorize the owners of a steamboat to employ her in ferrying.

5. The laws of the United States contain no regulations for ferries as such, while the states have exercised the right to license and regulate ferries from the commencement of the government to this day.

[Cited in U. S. v. The Seneca, Case No. 16,-251; distinguished in The Daniel Ball, Id. 3,564.]

In admiralty.

1 [Reported by John S. Newberry, Esq.]

John D. Cook, Dist. Atty., and Lyman D. Norris, for the United States and informers.

Benjamin F. Hickman, for owners of boat.

WELLS, District Judge. A libel was filed against the William Pope for a violation of the act of congress, approved July 7, 1838, to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam. The particular violation of the act charged in the libel, was navigating the Mississippi and transporting goods, wares and merchandise, &c., without first obtaining a license therefor, as provided in the second section of said act. The answer of the owners admitted that no license had been obtained from the United States, denied that any was necessary, and alleged, as their defence, that the boat was employed no otherwise than as a ferry boat across the river at St. Louis, under proper licenses, obtained from the state authorities of Illinois and Missouri. To the answer, the district attorney filed a demurrer; and the case was submitted on bill, answer and demurrer. This court held, in the case of U. S. v. The James Morrison [Case No. 15,465], that the act of 1838, above cited, did not apply to ferry boats. The opinion in that case was published; the case was taken, by appeal, to the circuit court; and the decree of the district court was affirmed. In delivering the opinion of the circuit court, the learned judge said that he affirmed the judgment, and altogether concurred in the opinion delivered by the district court; and that three of the judges of the supreme court had made, in their respective circuits, similar decisions, in cases, too, which were ferries over waters separating states. It was urged by the district attorney, in the argument of this case, that the act of 18th February, 1793, for enrolling and licensing ships or vessels to be employed in the coasting trade, &c., required licenses to be obtained only by vessels to be employed in the coasting trade or fisheries; but in regard to steamboats, the act of 1838 went further, and required licenses to be obtained by all steamboats, over twenty tons burden, navigating the waters of the United States, whether employed in the coasting trade, or in any other business, saying at the same time, that he did not controvert the decision in the case of The James Morrison, which was a steamboat employed in ferrying wholly within the limits of the state.

I think I might rest this case upon the argument contained in the opinion in The Morrison case; and upon the authority above mentioned; but I will give, briefly, my views upon the point made by the district attorney, in addition to what is said in that case. Does the act of 1838 require licenses to be obtained by all steamboats over twenty tons burden, employed on the navigable waters of the United States? If this question be answered in the affirmative, then the case of The Morri-

son was erroneously decided; yet the district attorney does not controvert that decision. If a steamboat were employed solely in carrying gravel from the Osage river for the streets of St. Louis, or employed solely in carrying railroad iron from manufactories on the Missouri, or Osage, to other points in the state. there to be laid on our own railroads, it would, if his proposition be true, have to obtain a license from the United States; and yet it is expressly declared by the supreme court of the United States. in the case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 194, that the completely internal commerce of a state is reserved to the state alone; all that commerce which is wholly within the state, and does not affect other states, or foreign countries, is of that description, and congress has no right to regulate it. It must be recollected that the power of congress extends only to the regulation of "commerce with foreign nations, among the several states, and with the Indian tribes." No one will contend that the employment of the steamboat above mentioned could constitute any part of that commerce, the regulation of which is intrusted to congress. It will also be noticed that there is no separate and distinct grant to congress of the power to regulate navigation. That is claimed as necessarily belonging to the power to regulate commerce. If congress has not the power to regulate the particular commerce, it can have no power to regulate the navigation employed in carrying on that commerce.

The above observations are made to show that the language employed in the act of 1838, should not receive a construction so comprehensive as that contended for; as it would involve a violation of the constitution by congress, which no court can presume to have been intended. It is true, that there are words used in the act of 1838, which are comprehensive enough to include all steamboats over twenty tons burden employed on the navigable waters of the United States. Thus it says: "It shall be the duty of all owners of steamboats"—"that it shall not be lawful for the owners, master or captain of any steamboat." But in looking at other parts of the act I think it will be apparent that it was not the intention of congress to apply the provisions of that act to all steamboats, but only to apply them to such as were before that time required to be licensed as coasting vessels. It provides that these vessels shall make a new enrollment. How could this be, if there had been no old enrollment? And shall obtain a new license. How could this be if there had been no old license? They shall make a new enrollment under existing laws, referring to the act of 18th February, 1793 [1 Stat. 305], for enrolling and licensing ships and vessels, which was the existing law. This new license is to be "under such conditions as are now (then) imposed by law, and as shall be imposed by

this act." Again in section second, it provides that it shall not be lawful for the owners, &c., of any steamboats to transport any goods, &c., after the 1st October, 1838, without having first obtained from the proper officer a license under the existing laws, and without having complied with the conditions imposed by this act. These provisions, I think, show that it was not the intention of congress to require by the act of 1838, any vessels to be enrolled and licensed, except those which were, before that, required to be enrolled and licensed; and that they should be required, before this new license was granted, to conform to the provisions of that act—such as having their hulls and boilers inspected, &c. Under the laws enacted previous to that of 1838, ferry boats were not required to be enrolled and licensed. Gibbons v. Ogden, 9 Wheat. [22 U. S.] 203; 2 Story, Comm. 515; 1 Kent, Comm. 437; 3 Cow. 754. The license required to be granted by the act of 1838, is a license to carry on "the coasting trade;" such are the licenses now actually granted, and no other. The coast is the shore. To coast is to navigate along the shore. "The coasting trade" is the trade along the shore. How absurd would it be to require a license to carry on the coasting trade, for a vessel that was engaged in no trade at all, and certainly in no coasting trade. A vessel that merely crosses the river as a ferry boat, can in no proper sense be said to be engaged in any trade; nor can it be said to coast or be employed in the coasting trade. A ferry I deem nothing but a continuation of a road. I admit that congress might, constitutionally, regulate the transit on roads and over ferries, so far as it is necessary to regulate the "commerce with foreign nations, among the several states, and with the Indian tribes," but no further. To regulate such transit, a variety of provisions not contained in the act of 1838, or in any other act of congress, would be necessary. Congress have not yet undertaken to separate the purely internal trade and intercourse of the people of a state on its roads, from the commerce among the several states. They have not yet undertaken to regulate, either on the roads or over the ferries, the passage of every market man with his chickens and pigs; or a man going to mill or to church, although passing from one state into another state.

The acts of congress require vessels engaged in the coasting trade, or in parts of the coasting trade, to prepare and exhibit manifests of their cargoes, or of parts of their cargoes, every voyage or trip. This would apply to ferry boats, in some parts of the United States, if they are considered vessels engaged in that trade, and to be licensed under the act of 1838. Some ferry boats cross as often as once in every ten minutes; they would have to inspect the contents of every wagon, and make out

a manifest every trip, night and day. If the act of 1838 applies to ferry boats, they would all have to visit St. Louis twice a year to have their hulls or boilers and machinery inspected. Some of these boats would have to go some five hundred miles and back, making a voyage of one thousand miles; some of them would never get back, being unable to stem the current. Whilst they were absent, another set of boats would be required to supply their places, or the ferries be without boats. A license from the United States and a license from a state cannot both be necessary to do the same thing; they cannot both be necessary to authorize the owners of a steamboat to employ her in ferrying. In the above cited case of Gibbons v. Ogden, the supreme court says: "The word 'license' means permission or authority; and a license to do any particular thing is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize." If, then, the United States have authority to grant a license, and under and by virtue of the laws of the United States such license be granted, then any license from the state to do the same thing would be wholly nugatory and inoperative. If the state has authority to grant a license, and does grant one, then a license from the United States would be wholly nugatory and inoperative. A license conveys the right to do the thing or it conveys no right; if it conveys the right to do the thing, then no other or further conveyance from any person can be necessary. A license from the United States to carry on the coasting trade, it is urged, is necessary for a steam ferry boat. If this be so, then a license from the state would be of no avail, and need not be obtained. The states have exercised the right to license and regulate ferries from the commencement of the government to this day.

The laws of the United States contain no regulations for ferries as such; they provide only for the security of the revenue of the United States, and against explosions of boilers, bad hulls, &c. The laws of the states contain a great number of regulations of ferries, as such, deemed highly essential, if not absolutely necessary, none of which are contained in the laws of the United States; they are also the subjects of taxation by the states. Thus the laws of Missouri provide: (1) A ferry must be necessary, and not so near as to conflict with another ferry. (2) The person applying for license must be a suitable person to be intrusted with a ferry. (3) He must pay the tax—it may amount to $500. (4) He must give bond, with sufficient security, conditioned for the faithful performance of his duties. (5) The rates of ferrying must be fixed, and he is not allowed to exceed them. (6) He is to keep good and suitable boats, and sufficient hands to attend on all occasions. (7) He is to give due attendance. (8) He is made liable for damages. (9) He is to keep the rates of ferriage posted up at the ferry. (10) Fines for various acts and omissions are specified, and the manner of collecting them, with a variety of other provisions. All these provisions are abrogated, if. the new doctrine be true, and none made to supply their place. If, as alleged, inspection of hulls and boilers be necessary, the states are competent to require it.

Congress has been careful not to encroach upon the jurisdiction or prerogatives of the states; and I think the court is not authorized, from anything in the act of 1838, to say that congress has made this great inroad into the ancient and hitherto undisputed jurisdiction of the states, and done so by mere implication—there not being one word in the act of 1838 about ferries or ferry boats. For a more full discussion of some points involved in the consideration of this case, I must refer to the opinion delivered in the case of U. S. v. The James Morrison [supra], a copy of which is filed herewith.

For the above reasons, the demurrer to the answer is overruled. this libel dismissed, and the bond given by the owners canceled, and a decree for costs against the informers.